GREAT NORTHERN RY. CO. v. SLOAN (two cases).†

(Circuit Court of Appeals, Ninth Circuit. April 1, 1912.)

No. 1,962.

RAILROADS (§§ 276, 282*)—INJURIES TO PERSONS ON TRAINS—LICENSEES OR TRESPASSERS—COLLISION.

The father of the two plaintiffs, who were boys, chartered a car from defendant railroad company for the carriage of his household goods and live stock and took plaintiffs with him in the car to help care for the stock. He signed a contract for the car, which provided that the names of all persons who were to accompany the stock must be stated thereon, but plaintiffs' names were not so stated, although the agent knew they were in the car, which they helped to load. Their father testified that the contract was not read to him and he did not know of the provision. There was no rule of the company which prohibited them from riding in the car if their names had been entered, and they supposed they were rightfully there. There was testimony, which was contradicted, that some, if not all, of the several conductors who had charge of the train knew of their presence in the car, and in any event no objection was made. The train overtook another, and, being lighter, was allowed to go ahead, and after proceeding 15 miles, while switching at a station in the night with the rear cars still on the main track, they were run into and wrecked by the following train, and plaintiffs were seriously injured. The rules of the company required that under such circumstances a flagman should at once be sent back to signal any following train, but this was not done. *Held,* that there was sufficient evidence to warrant a finding by the jury that plaintiffs were in the car with the permission of defendant, and that, even if they were trespassers, the evidence showed such gross carelessness and recklessness on the part of those in charge of the train as would sustain a verdict in plaintiffs' favor.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 878–886, 910–923; Dec. Dig. §§ 276, 282.*]

Hanford, District Judge, dissenting.

In Error to the Circuit Court of the United States for the Eastern Division of the Eastern District of Washington.

Consolidated actions at law by Wayland Sloan and Lewis Sloan, minors, by J. Sloan, their father and guardian ad litem, against the Great Northern Railway Company. Judgments for plaintiffs, and defendant brings error. Affirmed.

These are actions on the part of the plaintiffs by their guardian ad litem to recover damages for personal injuries caused by the wreck of a freight train on which plaintiffs were riding with their father, John Sloan. Prior to April 5, 1910, the plaintiffs, Wayland Sloan and Lewis Sloan, had lived with their father and mother at Everett in the state of Washington. Desiring to move to Chester, Mont., the father, John Sloan, applied to the local agent of the defendant at Everett for a car to carry certain live stock, household goods, personal property, and family effects to Chester, Mont. The charge for the car was $170. It was accordingly engaged by Sloan, and loaded on April 5, 1910. Sloan took with him his two boys, the plaintiffs, to assist him in taking care of the stock. The car was attached to a freight train going east on April 6, 1910. At Galena in the state of Washington, on the night of April 9, 1910, the train was wrecked and the plaintiffs severely injured. Suits were brought against the defendant to recover damages for these injuries, and upon the trial the two cases were consolidated and tried as one case. The jury returned a verdict in favor of Wayland Sloan for $14,000 and Lewis Sloan for $16,000. The defendant brings the case here by writ of error.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes
† Rehearing denied May 21, 1912.

L. F. Chester and William A. Monten, for plaintiff in error.

W. H. Plummer and Henry Jackson Darby, for defendants in error.

Before GILBERT and MORROW, Circuit Judges, and HANFORD, District Judge.

MORROW, Circuit Judge (after stating the facts as above). In submitting this case to the jury the court below instructed the jury that plaintiffs were not passengers upon the train upon which they were being carried at the time they were injured, and that they were not entitled to that high degree of care which, as passengers, they would have been entitled to receive.

What the court did was to submit to the jury the question of fact whether the plaintiffs were licensees or trespassers on defendant's train at the time of the accident. This the court did with appropriate instructions, to the effect that if plaintiffs were licensees the defendant owed to them the duty of exercising ordinary care for their safety and protection while being so carried, and if the defendant was negligent in this respect, and such negligence was the proximate cause of the injuries sustained by the plaintiffs, the defendant would be liable.

On the other hand, if the plaintiffs were trespassers, the court instructed the jury that defendant owed to them the duty of refraining from willfully, recklessly, and wantonly injuring them.

The court also instructed the jury that in finding that the plaintiffs were trespassers it was implied that the defendant was cognizant, in some way, of plaintiffs' presence on the train, and purposely ran the train to injure them; or recklessly ran and operated the train in disregard of plaintiffs' personal safety.

Whether the plaintiffs were licensees or trespassers turned upon the question whether the plaintiffs had the permission of the conductor to ride upon the train. If they had such permission, they were licensees. If they did not have such permission, they were trespassers. This was a question of fact for the jury.

The only question for this court to determine is whether there was sufficient evidence to justify the trial court in submitting the case to the jury upon either aspect. The defendant contends that the evidence shows that the plaintiffs were not licensees, but trespassers, and, as trespassers, defendant was not liable for the reason that there was no evidence tending to show that the accident was caused by the willful, reckless, and wanton negligence of the defendant, or that the defendant operated the train recklessly and in a willful disregard of plaintiffs' safety.

Was there any evidence tending to show that plaintiffs were licensees?

John Sloan, the father of the plaintiffs, chartered and loaded a freight car belonging to the defendant on April 5, 1910, at Everett, in the state of Washington, with certain live stock, household goods, personal property, and family effects, for transportation to Chester in the state of Montana. He testified that he loaded the car assisted by his two sons (plaintiffs), and the loading was completed between 8:30

and 9 o'clock on the evening of April 5th. The agent of the defendant at Everett came to the car after it was loaded, and asked the witness to come to the office and get the bill of lading and sign the contract for the car. Both of the boys were in the car at this time, and one of them asked the agent about what time the car would go out. The agent replied that he thought about 3 o'clock, but he was not sure. The witness went to the office, signed the contract, and paid the agent the sum of $170 for the car. The contract signed by the witness contained the following provision, among others:

"Agent must obtain names of persons who are to accompany the stock and enter them in space provided, certifying to them over his signature. He must also see that the parties sign their names in the spaces provided and in each case draw pen through blank lines. Only the owner, shipper, or his employés in actual charge of and accompanying stock, are entitled to free passage on account of the same, and agent must not endorse upon stock contracts as entitled to free passage, the name of any other person."

The contract also contained the following provision, which was indorsed on the back of the contract:

"The names of the parties entitled to transportation hereunder as accompanying the live stock must be given to the issuing agent and entered by him below, before delivery of contract to shipper. Agent must know correct name is entered, and only enter the names of those entitled to transportation under the regulations hereon, and run a pen through the remaining lines."

This indorsement was signed: "J. Sloan." Under his name was this provision:

"Parties whose names are above are in charge of and accompanying the stock from this station."

Then followed the signature of the agent at Everett Station.

The agent testified that he told Sloan that the charge for the car was $170 with one man in charge. Sloan testified that the contract was not read to him and that he was not informed by the agent or any one else that no one other than himself would be permitted to ride in said car. After signing this contract, Sloan entered upon the car with his two sons, for transportation to the point of destination.

In plaintiffs' cause of action no claim is made that they had the right under the contract to ride in the car as passengers, or that they are entitled to recover damages from the defendant by reason of any of the express contractual relations provided in the contract. What they claim is that they had permission and they believed that they had the right to ride in this car with their father because it had been chartered by their father for his use in transporting his effects.

Lewis Sloan, one of the plaintiffs, was a witness in the case. He was asked:

"I will ask you, Lewis, whether or not you believed that you had the right to ride in this car with your father and the stock when you got in and when you did ride up to the time of the wreck?"

His answer was:

"Yes, it just seemed to me like when he paid $170 that he was renting that car, just the same as he would a house."

On the night of April 5th the car was moved by a freight engine into the freight yards at Delta, 1¼ miles distant from the sta-

tion at Everett. The car was attached to a regular freight train about a quarter past 3 on the morning of the 6th of April. The train was in charge of Freight Conductor E. D. Wisner. Sloan testified that the conductor for this train called upon him at the car door at Delta for this contract and examined it. The conductor testified that he took the contract from Sloan at Monroe, 16 miles out from Delta, and entered it upon his report and returned it to Sloan at the next station; that he did not know at any time on that run that there was anybody in that car with Sloan; that he asked Sloan at the terminal at Delta if there was any one else in the car besides himself; that Sloan answered, "No," and for that reason the conductor says he did not take the contract at that time. On the other hand, Sloan testified that he took the boys along to help take care of the stock; that the door of the car was open most of the time, except at night; that there was no attempt to conceal the boys; that they helped him to take care of the stock. At one station where there was a wait to let a train go by, Sloan carried water from a stream to water the stock, and he handed it up to the boys in the car.

Conductor Wisner was in charge of this train to Tonga, a distance of 56 miles. At this point the conductor had been on duty 16 hours, and under section 2 of the Act of March 4, 1907, c. 2939, 34 Stat. 1416 (U. S. Comp. St. Supp. 1911, p. 1321), could not remain on duty longer. He was accordingly relieved, and I. E. Cleary took charge of the train at 1:30 a. m. on April 7th, and took it to Leavenworth, over the mountains, arriving at Leavenworth at 10:15 a. m. on the same day. This conductor testified that he first saw Sloan at Merritt Station, halfway down the mountains, at 8:35 a. m.; that in passing by his car he saw Sloan standing in the doorway; asked him if he was with the car, and he said "Yes"; but he did not look at the contract; asked if any one was with him, and he said, "No"; never saw him after that. At Leavenworth the car was set out and remained there for over 30 hours, for the purpose of securing a certificate from a veterinary surgeon to permit this live stock to be carried into the state of Montana. The stock was unloaded into the stock pen by Sloan and the two boys, who also helped to feed the stock. The stock was kept in the stock pen during the night. While at Leavenworth the boys were around the yards and in the town. On the afternoon of April 8th the stock was returned to the car, the boys again helping, and in the evening it was attached to the east-bound freight train which, about 8:45 in the evening, pulled out with J. R. Jones as conductor, who took the train to Wilson Creek, arriving at the latter station at about 9 o'clock on the morning of April 9th. This conductor testified to having seen Sloan at Leavenworth when he received and examined the contract, and he also saw him later in the evening at one of the stations. Sloan testified that the conductor got into the car with him during the evening, and he had a conversation with the conductor about matters which appear to have been irrelevant and were excluded by the court. During the conversation one of the boys coughed, and the conductor said, "I see you have a boy in here," and Sloan replied, "Yes, I have got a couple of boys in here." The conductor made no objection to the boys being in the car. At Wil-

196 F.—18

son Creek the car was cut out of the train and set to one side. It was afterwards attached to a train which left Wilson Creek about 3:30 or 4 o'clock in the afternoon. A. B. Chandler was the conductor of this train. Some time during the afternoon, after leaving Wilson Creek, the conductor called on Sloan for his contract. Sloan and both the plaintiffs testified that the conductor called at the car for this contract, and that the plaintiff Lewis was sitting on a bale of hay in the car, and the other plaintiff, Wayland, was milking the cow. Both were near enough to have been seen by the conductor. The conductor testified that as they left Wilson Creek he went back to the caboose. Sloan was in the caboose and handed him the contract, and asked him about the time that the train would get to. Spokane. The conductor invited Sloan to sit down, and he rode in the caboose to Irby, about 10 miles from Wilson Creek. The conductor testified that he did not see plaintiffs prior to the accident.

The train stopped 15 minutes at Edwall, a station 15 miles west of Galena. At this point the train on which plaintiffs were riding overtook another freight train going in the same direction. The latter train was called by the railroad men a "drag extra," while plaintiffs' train was called by the railroad men a "symbol extra." The symbol extra had a lighter tonnage than the drag extra, and was given the preference in running orders. The symbol extra accordingly passed the drag extra at Edwall and proceeded eastward toward Spokane. At about 11:35 plaintiffs' train arrived at Galena. Galena is a small station with a passing track, and what is designated as an industrial track in addition to the main track. The station is about 15 miles west of Spokane. The conductor had orders to set out cars from his train onto the industrial track, and accordingly the train pulled in on the passing track or switch, but did not clear the main track, two cars still remaining on the main track. Soon after the train stopped, it was discovered that a draw bar had pulled out of the second car back of the engine, breaking the train in two at this point. The crew of this train knew the freight train designated as the "drag extra" was following. When the engineer discovered that something had happened to his train, he got down from his engine, and walked back, and after having discovered the nature of the accident he returned to his engine and gave the "broken-in-two" signal. Thereupon the conductor started from the rear towards the engine, and he testified that the rear brakeman started for the rear end to signal the following train; but it was too late to protect the train from a collision. A rule of the company provided that:

"When a train stops or is delayed by any circumstances under which it may be overtaken by another train, the flagman must go back immediately with stop signals a sufficient distance to insure full protection. When recalled he may return to his train, first placing two torpedoes on the rail six rail lengths apart or a lighted fuse in the center of the track when the conditions require."

The following train, observing no signals, crashed into the rear end of the forward train, smashing six cars, including the car in which plaintiffs were riding. The plaintiff Wayland Sloan testified that while they were still under the wreck he heard the conductor say,

"There is a man and two boys in this wreck." The plaintiffs were both severely injured, such injuries being the subject of the present cause of action. The engineer of the forward train testified that the train had been at the station at Galena 10 or 15 minutes before the wreck occurred. The train had arrived at that point about 11:35, and the wreck occurred at 11:50. The rear brakeman of the forward train, who was sent back to signal the following train, was not produced as a witness, although it appeared that the officers of the defendant knew where he was at the time of the trial. There was evidence that the station at Galena was substantially in a level country, and that the track was straight in the direction from which these trains had come for a mile and a half. There is some evidence that a fog had begun to settle, but the night was not dark. The freight train that ran into the forward train left Edwall, 15 miles west of Galena, 1 hour and 45 minutes after the forward train had left that station. This is the testimony in brief. By the terms of the contract between plaintiffs' father and the railroad company they were not excluded from the train on which they were riding. That contract did not limit the number of shippers and employés in charge of a car of stock to one person. On the contrary, the implication is that the shipper was entitled to have with him such number of persons as would be necessary to properly take care of the stock, and this would be presumed even if it were not implied by the terms of the contract; but the contract required that the names of all such persons should be entered on the contract. The evidence tended to show that plaintiffs were taken by their father, who was the shipper of the stock, to help him take care of the stock. He failed, however, to enter their names on the contract. He testified that the contract was not read to him, and he said he knew nothing of its requirements in this respect, and there is no evidence that the plaintiffs would not have been carried as passengers without further and without additional charge had their names been entered on the contract. But they do not claim to have been passengers under the contract. What they do claim is that they had the implied permission of the defendant's officers to ride upon the train. The conductors read the contract, and if they saw the plaintiffs in the car, concerning which fact the testimony is conflicting, they might well have supposed that the absence of plaintiffs' names from the contract was an oversight, and that they should be permitted to ride on the train to help their father with the care of stock. The evidence was clearly sufficient to justify the jury in finding that the plaintiffs had the implied permission of the defendant's officers to ride on its train, and that under the law the plaintiffs were licensees. The jury was also justified from the evidence in finding that the defendant failed to exercise ordinary care for their protection while thus being carried on its train. This is sufficient to support the verdict in each case, and we need not discuss in detail the sufficiency of the evidence to support the verdict upon the theory that the plaintiffs were trespassers upon defendant's train.

There is certainly evidence tending to show gross carelessness amounting to recklessness in operating the train. The freight train that ran into and caused the wreck of the forward train left Edwall 1

hour and 45 minutes after plaintiffs' train had left. The following train was a slow freight train and was not being operated to overtake the forward train, which was of lighter tonnage and a faster train; nevertheless, in the short distance of 15 miles, it did overtake the forward train after having been delayed at Edwall an hour and 45 minutes. The conductor of the forward train testified that he dropped a fuse off at the mileboard, presumably a mile from the station at Galena, and he says that this fuse should have burned 10 minutes, and he expected it would protect his train sufficiently so that at the station he could walk back far enough to flag the following train. It did not protect the train or serve to signal the train following 15 minutes later, and he had no right to expect that it would. It burned out before the following train reached the point where the fuse had been dropped. The forward train had been at the station 15 minutes before the collision. In other words, the fuse had burnt out at least 5 minutes before the following train reached the point where it was to have been a signal to the following train to stop, and the forward train was still on the main track with its two rear cars. A rule of the road, as well as the rule of ordinary care for human life, required that the conductor or brakeman should have gone back immediately upon the stopping of his train with stop signals for the following train, and to a sufficient distance and for a sufficient time to insure full protection for the forward train. It is clear that for some reason either the rear brakeman or the conductor of the forward train, or perhaps both, did not do his or their duty in signaling the following train, and that he or they was or were grossly careless in not doing so. This evidence of gross carelessness and recklessness probably accounts for the absence of the brakeman from the witness stand. We are of opinion, therefore, that if the plaintiffs were deemed to have been trespassers, the evidence was sufficient to have justified the jury in finding the defendant operated its train so recklessly and in such disregard of plaintiffs' personal safety that defendant was liable in that aspect of the case.

There are numerous assignments of error relating to the admission of evidence, the refusal of the court to instruct the jury to return a verdict in favor of the defendant, and the instructions given by the court to the jury. It will serve no useful purpose to further discuss the various questions raised by these assignments in the view we take of the case. We have, however, carefully examined all the assignments, and we find no error in any of the proceedings of the court to which they relate.

We are of opinion, therefore, that the judgment of the court should be affirmed, and it is so ordered.

HANFORD, District Judge (dissenting). It is a prominent and conceded fact that the plaintiffs were not passengers entitled to hold the defendant responsible, as a carrier for hire, for their safe transportation; therefore, these cases have no foundation in law, other than the law of torts. The negligence and misdoings constituting the alleged tort were the negligence and misconduct of the defendant's servants and employés, and the defendant cannot be held liable for the conse-

quential injuries complained of, except by application of the rule of respondeat superior. Two theories are relied upon as grounds for the application of that rule, the first of which is that the plaintiffs were licensees and the defendant owed to them the duty of observing ordinary care for the safe operation of the trains upon its track, and as they were not in any way responsible for the collision by which they were injured, the defendant is legally obligated to compensate them for injuries which they suffered as a consequence of the collision which would not have happened, if the trains which came into collision had been managed and operated with the ordinary care required in the running of freight trains. The pivotal point in this proposition is the assumption that the plaintiffs were licensees. There was no affirmative act, invitation, or declaration of the defendant, or any of its agents or employés, conferring upon the plaintiffs the rights of licensees; the train was not in commission as a carrier of passengers, except to the limited extent indicated by the contract which entitled their father to make the journey in the car as a caretaker of the live stock, and the rules of the defendant prohibited the carrying of other passengers in that car. The claim that the plaintiffs were licensees is predicated upon the facts that they were visibly present in the car during the several days and nights intervening from the time of the departure of the train from Everett until the time of the collision and believed that they were entitled to make the journey in the car; that the several conductors and brakemen in charge of the train at different stages of the journey preceding the collision knew of their presence, knew that they had not paid fare as passengers, knew the contents and conditions of the contract for use of the car, and refrained from ejecting them therefrom, and did not inform them that they were not entitled to remain in the car, nor express objections.

The car was not provided for passengers to ride in, nor offered to the public as a passenger car, the conductors and trainmen did not have either actual or apparent authority to license any one to ride in it, and their failure to eject the plaintiffs was a breach or neglect of duty and a fraud upon their employer. As the plaintiffs were not enticed by any deceitful practice of the defendant's representatives to enter the car, they must be deemed to have assumed the risks of the journey, and no implied obligation of the defendant to accord to them the rights of licensees can be predicated upon mere negligence or a breach of duty on the part of its employés. Clark v. Colorado & N. W. R. Co., 165 Fed. 408, 91 C. C. A. 358, 19 L. R. A. (N. S.) 988.

Conceding that the plaintiffs were innocent of intentional wrongdoing in riding in the car, nevertheless they cannot assert rights as licensees without becoming participants as beneficiaries in the misconduct of the defendant's employés. The rule of respondeat superior is that:

"The principal is liable for the negligent acts of his agent, done in the course and within the scope of his employment, and this although the agent deviates from his instructions in the manner of doing the principal's business. But if the agent makes a willful departure from the business he is directed to transact, and then commits acts of negligence, the principal will be exonerated from all liability." 1 Am. & Eng. Enc. of Law (2d Ed.) 1155, 1156.

Applying that rule to this first theory of the plaintiffs' case, the defendant cannot be held to be legally obligated to observe the degree of care for safety due to licensees, and also legally liable in damages for a tort consisting of mere neglect to fulfill that obligation. This is so for the reason that the supposed obligation has no foundation other than an assumed implication, not arising from the exercise of a delegated authority, but from a breach of duty on the part of the trainmen. It is my opinion that the plaintiffs were not traveling on the defendant's train as licensees, and that this first theory of their case is untenable.

The second theory of the case is that, although the plaintiffs may not be regarded as passengers nor licensees, nevertheless the defendant is liable for injuries suffered as a consequence of injuries inflicted willfully and wantonly or by reckless operation of the trains in disregard of their safety; and it is charged that the conductor and brakeman of the train to which the car in which the plaintiffs were riding was attached were willfully and wantonly negligent in not taking effective measures, promptly, to protect the train, and that the engineer of the following train acted recklessly in running his train at a high rate of speed in coming to a station when, if he had been vigilant, he could have seen the cars on the track ahead of him in time to have avoided the collision. Willfulness, wantonness, and recklessness, as terms of aggravation in an accusation of wrongful conduct inflicting an injury, imply obstinate persistence in conscious neglect of duty, or the intentional doing of a vicious act regardless of whomsoever may be hurt. Collisions of trains or ships seldom, if ever, happen as results of willful, wanton, or reckless misconduct of the men responsible for their safe operation. The kind of negligence which produces collisions has its origin in human frailty, not in inhuman malevolence. In the supreme moment of fate, men on watch fail to be vigilant because, although "the spirit indeed is willing, the flesh is weak." There is not in this case a scintilla of evidence tending to prove that the conductor or brakeman intentionally permitted their train to be wrecked, nor that the engineer of the following train was more disregardful of the safety of others than he was of his own safety; and it is my opinion that the second theory of the case is also untenable.